## No. 10,884.

MRS. MARY MAY ET AL. vs. NEW ORLEANS & CARROLLTON RAILROAD COMPANY.

1. A purchase of immovables by the members of a commercial firm, made with the partnership funds and for account and use of the partnership as shown by the books of the latter, though the title be taken in the names of the individual members, has precisely the same effect as if the title had been taken in the name of the partnership. In either case the partners become joint owners, but, as between themselves, they hold for the benefit of the firm.

2. A transfer by one partner to his copartners, or to a third person of all his interest in the firm and its property, operates a divestiture of his beneficial interest in immovables held as above, and disables him from contesting the title of his transferee.

3. An assignment in bankruptcy under the bankrupt law of the United States, differing from a cession under the Louisiana insolvent laws, divests the bankrupt of his title to all his property and transfers the same to his assignee.

4. While the assignee holds the title in trust for the creditors, and as to any residuum after their satisfaction for the bankrupt, his title can not be divested without proper showing to, and order made by, the court which has the control and administration of the trust. Until this has been done, other courts must respect the title of the assignee, at least until his discharge.

May et al. vs. Railroad Co.

A PPEAL from the Civil District Court for the Parish of Orleans.
Rightor, J.

Leovy & Blair for Defendants and Appellants:

1. Title by purchase.—May never parted with his title to the property involved in
this suit. The sale of a railroad and appurtenances does not pass any corpo-
real property, but only incorporeal easements or rights and privileges. Bou-
vier's Dictionary, "Appurtenances," and authorities there cited. Besides, in
this case, the language of the act of sale excluded this property.

2. The attempted sale by the United States to certain parties was null and void
because there were no advertisements, no auction sale, no consent of the Sec-
retary of the United States Treasury, as required by United States Statutes.
United States vs. Jonas, 19 Wall. p. 604.

3. Prescription.—There could be no title by prescription because in the acts of
sale relied on by defendant there was no sale of the square involved in this
suit; but only such "right, title and interest" as vendor possessed; "but whether
a lease, a servitude, an usufruct or something else, is not stated." Laville vs.
Rightor, 17 La. 310; 3 R. R. 320; 10 R. R. 88; 11 R. R. 441. And the vendor possessed
no interest of any kind.

4. "A deed of right, title and interest" does not convey the fee, but only such right
in the estate as the grantor might have had.   16 Gray (Mass.), p. 332; 12 Picker-
ing, 458; 13 Pick. 463; 20 Mo. 81; 4 Mason, 264.

5. The evidence in this case shows that the defendants could not "honestly" have
believed themselves to be the owners of this property, that the title was not
sufficient to transfer the property, nor was the title of their vendor one of
"ownership," nor were they in good faith, nor had they "just reason" to be-
lieve themselves the owners. All of which are essential requirements to cre-
ate a legal title by prescription.  C. C. 501, 3481, 3483, 3486.  Marcade, Prescrip-
tion, pp. 194, 198, 200.  See also p. 305.

6. Res Judicata.—"The reasoning and opinion of the court are not res judicata un-
less the subject matter be definitely disposed of by the decree." "It is ele-
mentary that in the decree rendered and not in the opinion pronounced will
be found the thing adjudged." Penouilh vs. Abraham, 43 An. 214, and authori-
ties there cited.
A decision between a plaintiff and several co-defendants can not affect rights as
between co-defendants when the co-defendants have not pleaded as against
each other. Minn. Co. vs. Chamberlain, 3 Wall. 704; Russell vs. Place, 94 U. S., p.
606.   The parties must be adverse parties to constitute res judicata.  35 Ala.
312; 18 Ohio, 1; 5 Mass. 407; 61 Iowa, 290.

7. Bankruptcy.—The points in this subject are covered by Walling vs. Morefield,
33 An. 1174.
Where real estate is in possession of another party the bankrupt can only assign
a right of action.  1 Woods, 260; 5 Otto, 765; 13 Myers' Fed. Decisions, Secs.
1408, 1421.
Where property of a bankrupt has not been sold and creditors have not object-
ed, and are presumed to have been paid, it reverts to the bankrupt.  The as-
signee is a trustee for all parties, and when the bankrupt has been discharged
the bankrupt is entitled to what remains.  Walling Heirs, 33 An., p. 1174; Remy
vs. Municipality, 11 An. 158; Rivas vs. Hunstock, 2 R. R. 194; 6 La., p. 69; Bump on
Bankruptcy, pp. 215, 400; 2 Am. and Eng. Encyc. of Law, p. 72 (note); 17 Wall.
610; 13 Myers' Fed. Decis. Sec. 1434; Hennen's Dig., p. 689.

May et al. vs, Railroad Co.

8. Fraud.—It is not alleged in this case, but is stated in argument. It is never presumed. Nothing is left to inference, the omission to place property on the schedule must be wilful, if from oversight, mistake, accident or ignorance, there can be no imputation of fraud. 93 U. S. 326; 132 U. S. 611; Bump on Bankruptcy, pp. 324, 498; 13 Myers' Fed. Dig. Secs. 2480, 2325, 2528.

Besides, it can only be pleaded by one prejudiced by the act which constitutes the estoppel. 6 Wait's Actions and Defences, p. 630; 93 U. S. 326.

9. Two years' limitation, under the bankrupt law, applies, by the words of the statute, only to claims made by the assignee or by any one claiming under or through him. This is not a suit by an assignee or by any one claiming under or through him. May became an owner of the square by purchase in 1866 and never ceased to be the owner. The assignee was authorized as trustee to sell if necessary, but he did not sell. The trustee held in trust only; never as owner.

10. Rents, etc.—The possessor in bad faith is bound to restore to the lawful owner all the revenues of the property of which he has been deprived during the possession of the defendant; whether the bad faith of the latter be moral or merely legal or constructive. As possessors in bad faith defendants are responsible for the rents and revenues of the property from the date of their possession, and there can be no bar by prescription. Hennen's Dig., p. 1003, No. 1; 41 An. 493; 26 An. 733; 24 An. 253.

11. Money expended for taxes, etc., will not be allowed "where there is no pleading or prayer to support them." Germaine vs. Mallerich, 31 An. 373-74.

### *John M. Bonner* for Defendant and Appellee:

1. A natural tutrix, residing in another State, should either be appointed guardian of the minors according to the laws of her residence, or she should be confirmed and qualified according to the laws of this State, in order to stand in judgment before our courts. R. C. C. 363; 34 An. 129; R. C. C. 334, 335; C. P. 949; 2 An. 76; 3 An. 563.

2. When her capacity is questioned, the best and only evidence of her authority would be either letters of guardianship, or of tutrixship. R. C. C. 335, 336.

3. When a person becomes a bankrupt, the assignment of his property by the register to the assignee operates a complete divestiture of title out of the bankrupt and vests the same in the assignee, as fully and completely as if the bankrupt had signed the transfer with his own hand. Sec. 14 of Bankrupt Law of 1867; 1 Peters, 193; 17 How. 315; 97 U. S. 392; 98 U. S. 20; 99 U. S. 392; 102 U. S. 647; 31 An. 577.

4. Title once vested in the assignee remains there until it becomes divested by some act as solemn and as authoritative as that by which he became clothed with title. 27 N. W. R..527; 2 S. W. R. 909; 10 Humph. 588, and authorities above quoted.

5. Upon the death or removal of the assignee, the title must be formally transferred by deed to his successor. Sec. 18 of Act of 1867.

6. Under the Bankrupt Act, the title of the bankrupt is transferred to the assignee. Under State insolvent law, the title remains in the insolvent. R. C. C 2175, 2182.

7. The title to all property that T. P. May owned, or was entitled to have in April, 1871, having been vested in the assignee, by the assignment that was made to him by the register, all suits against adverse claimants, not brought within two years from that date, were forever barred. Sec. 2 of the Act of 1867; 98 U. S. 248; 102 U. S. 647; 122 U. S. 214; 132 U. S. 440.

8. Where real estate is shown to have been purchased by a partnership, a transfer by one partner of all his *interest in the partnership, its property*, stock, etc., will convey his interest in said real estate. 33 An. 1176; 26 An. 156; 35 An. 266; R. C. C. 2449.

9. If there is any doubt about an agreement, "the construction put upon it by both parties, or by one with the express or implied assent of the other, furnishes the rule for its interpretation." R. C. C. 1956.

10. A person acquiring immovable property from one who is not the owner, in good faith, under a title that would convey the property if it came from the real owner, secures a good title by the adverse possession of ten years. R. C. C. 3478; 30 An. 935; 37 An. 417; 38 An. 209; 38 An. 885; 41 An. 1023.

a. Good faith is always presumed, and he who alleges bad faith must prove it. R. C. C. 3481.

b. It is sufficient if possession begins in good faith. R. C. C. 3482.

c. He is a *bona fide* possessor who possesses as owner by virtue of an act sufficient in terms to transfer the property, the defects of which he was ignorant. R. C. C. 503, 3451.

d. The party must also hold under a just title. And a just title is not one derived from the real owner, but from one honestly believed to be the real owner; provided the title is such as to transfer the property if it came from the real owner. 3483, 3484, 3485.

e. If the title on its face is sufficient to transfer the property if it came from the real owner, that is enough, and the defendant is not obliged to look at anything outside of his own act. 4 N. S. 225; 11 O. S. 714; 3 An. 8; 5 An. 380; 34 An. 708.

f. The means of obtaining knowledge is not equivalent to actual knowledge, and nothing but actual knowledge of the defect of title will prevent prescription of ten years. 4 La. 274; 7 An. 3; 27 An. 596; 30 An. 935; 37 An. 417; 38 An. 209, 885; 41 An. 653.

g. The entire absence of a power of attorney is cured by the prescription of ten years. 8 La. 248; 10 La. 284; 27 An. 596.

11. "If a man knowingly, although he does it passively, by looking on, suffers another to purchase and expend money on land under an erroneous opinion of title, without making known his own claim, he shall not afterwards be permitted to exercise his legal right against such person." 102 U. S. 68; 99 U. S. 110; 100 U. S. 578; 35 An. 743; 31 An. 581.

---

The opinion of the court was delivered by

FENNER, J. The pertinent and controlling facts in the case are as follows:

On the 12th of April, 1866, G. T. Beauregard leased the railroad belonging to the New Orleans & Carrollton Railroad Co., for the term of twenty-five years, with the stipulation that the same should be converted from a steam into a horse railroad at the expense of the lessee, and with the further stipulation that at the expiration of the lease the road and improvements should revert to the lessor.

Thomas P. May and A. C. Graham signed the lease as sureties of the lessee.

On April 18, 1866, Beauregard, May and Graham entered into a copartnership by notarial act, which declared that the lease above referred to was to be held for the joint account; that Beauregard was to conduct, manage and direct the enterprise; that May and Graham were to furnish the money necessary to carry it on, in amounts and at dates specified; that books of accounts were to be kept, and that each partner was to have an equal one-third of the net profits.

The act of copartnership does not give any firm name to the partnership; but the evidence shows that the business was conducted and the books were kept under the name of the Carrollton Railroad Company.

One of the first necessities of the enterprise was to establish stables for the live stock employed therein. Accordingly a square of ground, being the property here in controversy, was purchased for that purpose.

The title was taken in the individual names of the partners in the proportion of one undivided third each; but the books of the partnership show that the cash portion of the price was paid by a check of the partnership, and said books further expressly declare that the purchase was made "by the partnership."

They also show that the first deferred payment, due May 8, 1867, was paid by the partnership.

Stables were built on the property, and it was used by the partnership in its business.

Subsequently Thos. P. May, by facts not necessary to mention, became a debtor of the United States in an enormous sum. By an act passed on May 14, 1867, May assigned to the United States, in part payment of his debt, a large amount of property, "real, personal and mixed," itemized in the act, and comprising the following, viz.: "The interest of the said May in and to the Carrollton Railroad Company, and the property, stock and appurtenances thereto belonging, the value of which is estimated at $480,000."

By a further clause in said act May bound himself to "sign and execute all acts or other instruments of writing that may be necessary to give to the United States full, complete and valid titles to the property herein transferred."

Accordingly, on May 16, 1887, May executed a further and more specific transfer to the United States of his interest " in and to the New Orleans & Carrollton Railroad, the lease and other franchises thereof, and the railroad tracks, rolling stock, engines, cars, live stock and other appurtenances thereunto belonging," proceeding to refer to and particularly describe the nature of the property and interests as fixed by the terms of the lease and the articles of co-partnership. The act further recites that it was " executed in confirmation of the act of transfer of the transfer of said right, title and interest in the said railroad and the said lease thereof, and of other property, real and personal, belonging to said May, passed on May 14, 1867."

On October 31, 1867, the United States executed an act of transfer to Bonneval, Hernandez and Binder, of all its right, title and interest in and to the property therein described, including:

1. Its interest in the lease of the railroad.

2. In the partnership between May, Graham and Beauregard; and

3. Various pieces of real estate specifically described, and, amongst others, the square of ground in controversy.

In the same month an act was passed between the New Orleans & Carrollton Railroad Company, Beauregard, Bonneval, Binder and Hernandez, by which this property passed to the present defendant, which has since possessed, occupied and used the same.

In April, 1871, Thomas P. May availed himself of the bankrupt law of 1867.

His schedules exhibited large debts and no assets whatever. He specifically declared therein, under oath, that he had no real estate, and that there was none " to the possession or enjoyment of which he is entitled."

He also inserted therein the following sworn statement:

" In May, 1867, by acts before Graham, notary, I transferred, to secure the United States, *all my real and personal property*, consisting of real estate in square bounded by Canal, etc., * * * the Payne plantation, etc., * * * *my interest in Carrollton Railroad*," etc.

A regular assignment was executed to E. E. Norton, assignee, who has never been discharged.

There being no property surrendered as appeared by the schedules, no creditor appeared to prove his debt. In due course May obtained his discharge.

29

He subsequently left New Orleans and died in London, England, in 1887.

The present is a petitory action brought by his major daughter and by his widow as tutrix of his two minor children, to recover his interest in the square of ground hereinbefore alluded to, alleging that May validly purchased the same in 1866, had never sold or conveyed it, died in the ownership thereof, and that plaintiffs inherited the same from him; that defendant is a wrongful possessor and should be condemned to deliver the same and also to pay $46,000 as rents and revenues.

Numerous defences are interposed which we shall consider, as far as necessary, in disposing of the case.

I.

Whatever sympathy we might feel with the children of May, we are bound to recognize the fact that they stand in the shoes of their father, and have no title to any consideration which would not be extended to him if he were personally plaintiff. If there be any ambiguity in the acts by which it is claimed that May had divested himself of this property, his acts, words and conduct showing the meaning and effect which he himself attributed to them should have great weight in their construction.

His sworn declarations, which we have quoted from his bankruptcy proceedings, admit of but one of two explanations: Either (1) that he interpreted and intended his transfers to the United States as operating a divestiture of his title to this property; or (2) that he designedly concealed his interest with the purpose of defrauding his creditors.

The first hypothesis would go far toward ending this controversy. The second would drive him away from the portals of justice as coming with unclean hands. Hood vs. Frellson, 31 An. 577.

The first is unquestionably the correct hypothesis, which his children will hardly dispute, and which is maintained by May's silent acquiescence in the effect given to his conveyances down to the day of his death.

We can not concur in the restrictive interpretation placed by counsel for plaintiffs on May's sworn statement in his bankruptcy schedules that he had transferred to the United States " all his property real and personal." He claims that this expression is limited

by the succeeding statement mentioning the particular properties so transferred. We think the proper construction is reached, not by restricting the words "all his property," but by amplifying the meaning of the succeeding descriptive terms, and by attributing to the words "my interest to the Carrollton railroad," the signification of his interest in everything connected with the road, including the partnership and all its property. No other interpretation is consistent with reason and honesty; for if he did not mean "all his property," why did he use that phrase? And if he meant to exclude any property, why does it not appear on his schedule?

It is obvious that this declaration was made to explain why he had no property to surrender and surrendered none. It is nothing less than a solemn declaration under oath that May intended by his acts of transfer to the United States to embrace all his property, including that here in controversy.

II.

There can be no doubt that by the act of May 14, 1867, May intended to transfer and did transfer to the United States his interest in the partnership between Beauregard, Graham and himself, and in all the property belonging to it. The terms used admit of no other interpretation. The Carrollton Railroad Company was the firm name in which the partnership conducted its business and kept the books of account required by the articles. He transferred his interest, not in the railroad, but in the railroad company, and in the property belonging to the company. The distinction is emphasized by the succeeding act of May 16, which was obviously intended to make a more specific and descriptive transfer of his particular interest in the railroad itself, the lease thereof, and its franchises and appurtenances.

· It is equally clear, under the evidence, that this square of ground was bought and paid for with the funds, and for the account and use, of the partnership. The books of the partnership explicitly show this, and May has never contradicted, and could not contradict them, at least without showing fraud. Every fact in the case fully corroborates the books.

Such a purchase of immovable property by members of a commercial partnership, with the partnership funds and for the partnership account, though the title be taken in the name of the individual

partners, has precisely the same effect as if the title were taken in the name of the partnership. In either case the individual partners become joint owners. Allen vs. Whetstone, 35 An. 849; Thomas vs. Scott, 3 Rob. 256.

But though the legal title vests in the individual partners and the share of each is liable to seizure for his individual debts, yet, as between the partners, the property is equitably and practically partnership property.

This subject was dealt with by this court in the case of Bacas vs. Ramos, 10 La. 417, where the title to the immovable was taken in the name of "J. Ramos, A. Bacas and J. Preba, partners trading under the firm and style of J. Ramos & Co." After the purchase Bacas transferred his interest in the partnership to his copartners. He subsequently claimed that this transfer did not divest his ownership of the above immovable, and sued his former partners for a partition thereof. Judge Martin, as organ of the court, said: "The only question which this case presents is, whether the house and lot was part of the partnership property. The counsel for plaintiff contends that this is joint property, in which he is a joint owner, and not partnership property. 3 La. Rep. 496. The act of sale by which the premises were acquired shows that the purchase was made by the parties to this suit as partners, trading under the firm of Joseph Ramos & Co., and a note was given for one-half the price, bearing the signature of the firm. The partners were joint owners, and either of them might have sold his undivided share or interest in the property, which was liable to seizure for his private debts. But in case of such sale and seizure, he must have accounted to his partners for the price. Neither could he have occupied any part of the property for his private use, without compensating his copartners. In fact, the title to one undivided third was in him, but the value thereof belonged to the partnership. When the plaintiff withdrew from the firm and received a given sum, he relinquished his interest in the value of the house and lot in question to his copartners. He has, therefore, no right to demand a sale for partition, as immediately after it the price, being the value of the premises, would instantly become the property of defendants. The distinction which we have taken between the title by which the property is held and the value thereof is well known in the other States of the Union, where the common law prevails. These rights

are there distinguished by the expressions ' legal title ' and ' equitable title.' There, courts of equity enforce the rights of the equitable owner by compelling the legal one to make a conveyance to the other, precisely as this court did in the case of Hall vs. Sprigg, 7 Mart. 243.''

This case was affirmed, and like principles announced in a later decision. Thomas vs. Scott, 3 Rob. 256.

We consider that these authorities dispose of May's rights in this case. If a transfer, by one partner to his copartners, of the former's interest in the partnership divests his beneficial interest in immovables held by the partners jointly for account of the firm, a like transfer to a third person can not have a less effect. In the latter, as in the former case, the transferror is disabled from contesting the title of his transferee, or from setting up adverse claims on such property.

We, therefore, hold that the transfer by May to the United States had precisely the effect which both parties obviously, at the time of the contract and ever afterward, intended and considered that it should have, viz.: A valid divestiture of May's rights in the property in controversy.

As plaintiffs must recover on the strength of their own title, and not on the weakness of that of defendant, we have no occasion to discuss the questions raised as to the validity of subsequent transfers by the United States and its assigns to the defendant.

### III.

The foregoing views render it unnecessary to discuss at length the defence based upon May's assignment in bankruptcy, as operating a divestiture of his title which would bar this action. We have, however, studied the question very closely, under the light thrown upon it by the authorities cited, and by the very able arguments on both sides.

The decisions of this court to the effect that cession of property under our State insolvent law does not operate a translation of title have no application to the United States Bankrupt laws, because they are based on express provisions of our Civil Code, of which it is only necessary to quote Arts. 2175 and 2178:

"The *surrender does not give the property to the creditors;* it only gives them *the right of selling it* for their benefit and receiving the income of it, until sold." Art. 2175.

" As the debtor *preserves his ownership of the property surrendered,* he may divest the creditors of their *possession* of the same, at any time before they have sold it, by paying the amount of his debts, with the expenses attending the cession." Art. 2178.

The bankrupt law contains no such provisions, but, on the contrary, declares:

" As soon as the assignee is appointed and qualified, the judge, or, where there is no opposing interest, the register, shall, by an instrument under his hand, assign and convey to the assignee all the estate, real and personal, of the bankrupt, with all his deeds, books and papers relating thereto, and such assignment shall relate back to the commencement of said proceeding in bankruptcy, and *thereupon, by operation of law, the* TITLE *to all such property and estate, both real and personal,* SHALL VEST IN SAID ASSIGNEE." * * * Sec. 14 of Bankrupt Act of 1867.

That the assignee holds the title in trust, first for the creditors, and, as to any residumn after their satisfaction, for the bankrupt, is doubtless true. But it is certainly not in the power of the bankrupt, by his simple *ipse dixit,* to terminate the trust and divest the title of the assignee in his own favor. If he has reasons to urge why the assignee's title should be terminated, and the property restored to him as residuary *cestui que* trust, this is not the forum in which to vindicate them. He must go to the court which has the control and administration of the trust, and there make his showing and obtain such relief as he is entitled to. Bump on Bankruptcy, 10 Ed., pp. 247 and 248.

Until then this and every other court must respect the title of the assignee. Erwin vs. U. S., 97 U. S. 392; Clark vs. Clark, 17 How. 315; Vasse vs. Comegys, 1 Peters, 193.

Judgment affirmed.